GIBRALTAR CASUALTY COMPANY, Plaintiff-Appellant, v. A. EPSTEIN AND SONS, INTERNATIONAL, INC., *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—89—0133

Opinion filed October 15, 1990.—Rehearing denied December 26, 1990.

Trizna & Lepri, of Chicago (Robert J. Lepri and Daniel J. Fumagalli, of counsel), for appellant.

Foran, Wiss & Schultz, of Chicago (Nicholas J. Etten and Douglas R. Stevens, of counsel), for appellees.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff, Gibraltar Casualty Company (Gibraltar), appeals from an order dismissing its third amended complaint, which sought a declaratory judgment that the claims-made professional liability insurance policy it had issued to defendants, A. Epstein and Sons, International, Inc., Epstein Construction, Inc., and A. Epstein and Sons, Inc. (collectively known as Epstein), was not applicable to a lawsuit filed by Hammond-Columbia Refrigerated Warehouse, Inc., Kelaron Corporation, Inc., Chilewich Corporation, d/b/a Kelwich Realty Partnership, and American National Bank, as trustee (collectively known as Hammond-Columbia), against Epstein for damages arising from roof repair work at Hammond-Columbia's warehouse, and that Gibraltar had no duty to defend Epstein or to pay any judgment which may arise from the lawsuit. On appeal, Gibraltar contends that: (1) Epstein's failure to report the Hammond-Columbia roof collapse in its application for the claims-made policy bars Epstein from claiming insurance coverage for that matter; (2) a letter sent from Hammond-Co-

lumbia's attorney to Epstein, prior to the effective date of the Gibraltar policy, indicating that a preliminary investigation revealed that Hammond-Columbia had been "substantially damaged" due to Epstein's "negligence, nonfeasance and malfeasance" constituted notice of claim to Epstein, thereby barring coverage; and (3) the trial court erroneously reversed its previous position when it dismissed Gibraltar's third amended complaint. For the following reasons, the judgment of the trial court is affirmed.

The events giving rise to this action are as follows. In April 1982, Hammond-Columbia engaged Epstein to furnish design and construction management services in connection with the repair of a damaged roof structure at Hammond-Columbia's refrigerated warehouse. Most of the temporary stabilization of the roof was completed in April and some permanent repair was done in June. On the evening of July 18, 1982, the roof collapsed again in the area under repair, creating an opening in the roof approximately 10 feet in diameter. The following day, Epstein designed and constructed a temporary cover over the opening in the roof.

Approximately one week later, Epstein received a letter via certified mail, dated July 23, 1982, from Hammond-Columbia's attorney, Michael Basofin, which stated:

"Dear Mr. Basich:

This firm represents Kelaron Corporation, Hammond Columbia Refrigerated Warehouse, Inc., and all their respective affiliates with regard to the above-captioned property.

This is to confirm that A. Epstein Group of Companies, including, but not limited to, Epstein Construction, Inc. and A. Epstein and Sons, Inc. will do nothing further with regard to the above-captioned project.

Preliminary investigation has revealed that our client has been substantially damaged due to the negligence, nonfeasance and malfeasance of the Epstein Group of Companies and certain individuals.

Please have your counsel contact me."

Although Epstein's attorney, Timothy Kocian, contacted Basofin after receiving the letter, the parties agree that neither the July 23, 1982, letter nor events relating to any alleged negligence were ever discussed. Instead, Kocian made demands for payment by Hammond-Columbia for work done on the warehouse roof.

Subsequently, in early February 1983, Epstein completed an application for a claims-made "Architects and Engineers Professional Liability Insurance Policy" to be issued by Gibraltar. Of particular rele-

vance to this appeal is question no. 24, parts "a" and "b," on the application.

Part "a" asked:

> "Has the firm or any of its members any knowledge of prior acts, errors or omissions which might reasonably be expected to give rise to a claim under this insurance?"

Epstein replied, "No." Part "b" asked:

> "Does the firm or any of its members have knowledge of any deficiencies, property damage or bodily injury, whether actual or alleged, in connection with projects upon which the firm has performed professional services?"

In reply, Epstein attached a six-page list of lawsuits to which it was or is a party, indicating the status of each suit.

Subsequently, Gibraltar issued to Epstein a claims-made "Architects and Engineers Professional Liability Insurance Policy" (the Policy), effective from January 22, 1983, to January 22, 1984. Pursuant to the Policy, "claims-made" means that the insured is covered for claims of which the insured had no prior knowledge and which are first reported to Gibraltar during the policy period, but not following the expiration date. Coverage was subject to all the provisions of the Policy. Endorsement 7 of the Policy, entitled "Specific Claims Situations/Incidences—Exclusion Endorsement," further provided that insurance under the Policy "does not apply to loss or injury to person or property or professional acts, errors or omissions arising out of" the insured's "performance involving claims or situations which were detailed by [the insured] on [the] application for insurance as described below." An itemization of the lawsuits set forth on Epstein's application in answer to question 24b was then set forth on the endorsement.

Thereafter, in a letter dated September 16, 1983, Epstein was advised by the law firm of Clausen, Miller, Gorman, Caffrey and Witous that Clausen had been retained by First State Insurance Company and the Kelaron Corporation to represent them in a negligence suit against Epstein for damages sustained as a result of the roof collapse at the Hammond-Columbia warehouse on July 18, 1982. The letter stated that a lawsuit would be filed and requested that Epstein ask its liability carrier to contact Clausen to discuss resolution of the matter. Epstein's counsel, Timothy Kocian, sent a copy of the letter to Gibraltar's agent on September 22, 1983, and asked for confirmation that the claim was covered under the Policy. Hammond-Columbia filed its suit and Gibraltar denied coverage.

On January 29, 1985, Gibraltar filed its complaint for declaratory

judgment, alleging that the July 23, 1982, letter from Hammond-Columbia constituted first notice of a claim, thereby precluding coverage under the Policy. Gibraltar subsequently amended its complaint twice to add various defendants. On October 23, 1986, Gibraltar moved for summary judgment on the ground that, pursuant to the July 23, 1982, letter, Epstein had knowledge of Hammond-Columbia's claim prior to the effective date of Gibraltar's policy. For reasons not evident in the record, Gibraltar was granted leave to withdraw its motion for summary judgment without prejudice and to refile the motion on January 9, 1987. Gibraltar's motion was then denied on the ground that questions of fact existed as to whether the July 23, 1982, letter constituted a claim.

Epstein then moved for summary judgment and Gibraltar filed an amended motion for summary judgment, based on new facts. Epstein's motion was granted and Gibraltar was given leave to file a third amended complaint. Gibraltar's third amended complaint added counts I and II, alleging that Epstein had fraudulently withheld information as to prior claims on its application for insurance and, therefore, coverage was barred pursuant to section 154 of the Insurance Code (Ill. Rev. Stat. 1987, ch. 73, par. 766). In addition, Gibraltar realleged that the July 23, 1982, letter constituted a claim (count III). In response, Epstein moved to dismiss counts I and II of the third amended complaint on the ground that Gibraltar had failed to meet the requirement of section 154 that no misrepresentation by an insured shall defeat or avoid an insurance policy unless the application in which the alleged misrepresentation is contained is attached to or endorsed on the policy and made a part of the policy. With respect to count III, Epstein argued that it should be dismissed based upon the prior summary judgment ruling. The trial court granted Epstein's motion to dismiss and denied Gibraltar's request for leave to file a fourth amended complaint. Gibraltar's timely appeal followed.

Initially, Gibraltar contends that pursuant to section 154 of the Insurance Code (Ill. Rev. Stat. 1987, ch. 73, par. 766), Epstein's failure to report on the application a possible claim arising from the Hammond-Columbia roof collapse bars Epstein from seeking coverage under the Policy for claims arising from the roof collapse. In response, Epstein contends that section 154 is an absolute bar to Gibraltar's allegations of Epstein's misrepresentations on its insurance application because Gibraltar failed to meet the threshold requirements of section 154, *i.e.*, the insurer must recite the alleged misrepresentations in the policy, attach the written application containing the misrepresentations to the policy, or endorse the written application on

the policy and make it a part thereof. Section 154 provides:

"No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor, of which a copy is attached to or endorsed on the policy, and made a part thereof. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." Ill. Rev. Stat. 1987, ch. 73, par. 766.

■ The primary purpose of section 154 is to allow for objective evidence of negotiations at the time of application for protection of the insured from possible frauds by insurance agents in falsifying answers given by the insured in applying for insurance. (*Inter-Insurance Exchange of Chicago Motor Club v. Milwaukee Mutual Insurance Co.* (1978), 61 Ill. App. 3d 928, 378 N.E.2d 391.) In reviewing insurance policies in the context of an issue regarding an insurer's compliance with section 154, courts require strict compliance with section 154's requirements and, if the insurer has not attached the application to the policy, the policy must include a specific, unambiguous statement indicating the misrepresentation. (*International Amphitheatre Co. v. Vanguard Underwriters Insurance Co.* (1988), 177 Ill. App. 3d 555, 532 N.E.2d 493; *Mollihan v. Stephany* (1977), 52 Ill. App. 3d 1034, 368 N.E.2d 465; *Government Employees Insurance Co. v. Dennis* (1965), 65 Ill. App. 2d 365, 212 N.E.2d 759; *Loving v. Allstate Insurance Co.* (1958), 17 Ill. App. 2d 230, 149 N.E.2d 641.) A mere statement in the insurance policy that the insured's statements were made a part of the policy (*Economy Fire & Casualty Co. v. Thornsberry* (1978), 66 Ill. App. 3d 225, 383 N.E.2d 780), or a general reference to the application in the policy (see *Spence v. Central Accident Insurance Co.* (1908), 236 Ill. 444, 86 N.E. 104), without more specificity, do not satisfy the requirements of section 154.

In the present case, question 24 on Epstein's application for insurance provides the basis for Gibraltar's allegations of misrepresentation. Gibraltar contends that, in reliance on Epstein's answers to question 24, it attached Endorsement 7 to the Policy, which was entitled, "Specific Claims Situations/ Incidences Exclusion Endorsement (Endorsement 7)." The introductory paragraph to Endorsement 7 states:

"It is hereby agreed that such insurance as is afforded by this policy does not apply to loss or injury to person or property or professional acts, errors, or omissions arising out of your performance involving claims or situations which were detailed by you on your application for insurance as described below."

Following the introductory paragraph, the endorsement contained an itemization of the lawsuits Epstein had set forth in response to question 24b on the application. The Hammond-Columbia roof collapse was not referenced in Epstein's application and does not appear in Endorsement 7. Gibraltar contends that Epstein's failure to list the Hammond-Columbia warehouse roof collapse constituted a misrepresentation by omission, which is evidenced in the Policy by the absence of the Hammond-Columbia roof collapse from the list on Endorsement 7.

■ Although clear reference in an insurance policy to the misrepresentation made in the application has been held to constitute sufficient compliance with the requirements of section 154 (*Mollihan v. Stephany* (1977), 52 Ill. App. 3d 1034, 368 N.E.2d 465; *Government Employees Insurance Co. v. Dennis* (1965), 65 Ill. App. 2d 365, 212 N.E.2d 759), the reference must be specific and unambiguous. In *Mollihan*, the insured stated in his application for automobile insurance that a driver's license had never been suspended, revoked or refused for himself or any family member for the past three years. In fact, his wife had had her license revoked. In reliance on the application, the declaration in the policy stated that: "No license to drive or registration has been suspended, revoked or refused for the named insured or any member of his household within the past three years." (*Mollihan*, 52 Ill. App. 3d at 1040.) Subsequently, in denying coverage to the insured, the insurer alleged the misrepresentation. The *Mollihan* court held that the statement in the declaration set forth the misrepresentation and thereby complied with section 154's requirements.

Similarly, in *Government Employees Insurance Co. v. Dennis* (1965), 65 Ill. App. 2d 365, 212 N.E.2d 759, the declaration to the policy stated that the insured owned both cars. The statement of ownership constituted the alleged misrepresentation upon which the insurer denied coverage. The court held that the statement in the declaration complied with the requirements of section 154 even though the application was not attached.

■ Unlike the policy references to the alleged misrepresentations in *Mollihan* and *Government Employees Insurance Co.*, the reference in the Policy to Epstein's alleged misrepresentation is generalized and oblique. Although a misrepresentation by omission cannot be set forth

in an affirmative statement, there is no indication in the Policy that Gibraltar had considered Epstein's answer to question 24 to be a complete list of all projects and, as such, that list in its entirety provided the basis for Endorsement 7. Instead, Endorsement 7 makes a general reference to the application and provides no basis for the exclusion of coverage for the listed projects. In other words, there is no indication on Endorsement 7 that denial of coverage for the listed projects was predicated on Epstein's answer to questions 24a and 24b.

At the hearing on Epstein's motion to dismiss the third amended complaint, the trial court suggested ways in which the Policy could have been made more specific:

> "[T]o be stated in the policy in accordance with *Mollihan*, you would say, 'The firm or its members do not have any knowledge of prior acts; and such and such ***; as contained in 24A.' And further, '[T]hey do not have any knowledge of deficiencies, property damage, and so on and so forth as contained in B.'
>
> So if that was in the policy, you could rely on the exclusion.
>
>       \* \* \*
>
> I would accept your argument [that the misrepresentation was stated in the Policy] if, in fact, that paragraph said, 'This has been stated by you to be a complete list of *** property damage, professional acts, errors, omission arising out,' and so on and so forth. And it was not there. It would have been included by way of omission.
>
> This is a complete list. It's not there. All this says is these are situations to which the policy does not apply."

While this court does not hold that if the trial court's suggestions were followed in another case, the insurer would have necessarily complied with section 154, we agree with the trial court that, under the facts and circumstances of this case, had statements with that degree of specificity been present in the Policy, the likelihood of Gibraltar having satisfied the requirements of section 154 would have been greatly increased.

■ Next, Gibraltar argues that the July 23, 1982, letter constituted a notice of claim against Epstein, thereby barring coverage under Gibraltar's claims-made policy. In determining whether an insured has had notice of a claim prior to the effective date of a claims-made policy, courts look to the language of the particular policy's claims-made provision, which indicates the degree of awareness on the insured's part which will constitute "notice." (*Stiefel v. Illinois Union Insurance Co.* (1983), 116 Ill. App. 3d 352, 452 N.E.2d 73; *Hoyt v. St.*

*Paul Fire & Marine Insurance Co.* (9th Cir. 1979), 607 F.2d 864; *Bensalem Township v. Western World Insurance Co.* (E.D. Pa. 1985), 609 F. Supp. 1343.) In *Stiefel*, plaintiff, an attorney, received a letter, dated December 22, 1976, from attorney Richard Price, which stated, in pertinent part:

> "We have been retained by Larry LaCroix, Donna LaCroix, James York and Janis York to prosecute their claim for damages arising out of your advice, action and inaction surrounding the demise of Countryside Porsch & Audi, Inc.
>
> * * *
>
> Please refer this matter to your errors and omissions carrier. Unless I hear from them, suit will be filed on January 20, 1977." (*Stiefel*, 116 Ill. App. 3d at 354.)

Plaintiff responded to the letter, explaining the circumstances and claiming that the allegations of professional malpractice were untrue. Contrary to the contents of the letter, no lawsuit was filed against plaintiff on January 20, 1977. However, a malpractice suit was filed on February 3, 1978.

Between the time the letter was received and the lawsuit filed, plaintiff applied for a claims-made malpractice insurance policy from Illinois Union Insurance Co. (IUI). On the application, plaintiff stated that he was not aware of any circumstance, error, omission or offense which might result in any claim being made against him. Based on the information supplied in the application, IUI issued its policy, which provided that it would apply "to negligent acts, errors, omissions or offenses which occur anywhere in the world: *** prior to the effective date of the Policy if claim is first made during the Policy period and providing no insured had knowledge nor could have reasonably foreseen any circumstance which might result in a claim at the effective date of the Policy ***." *Stiefel*, 116 Ill. App. 3d at 354.

After the lawsuit was filed, IUI denied coverage on the grounds that based upon the December 22, 1976, letter, plaintiff could have reasonably foreseen that a malpractice claim might result from its representation of Countryside Porsch & Audi, Inc. In response, plaintiff argued that a claim did not arise until suit was filed on February 3, 1978. The trial court granted IUI's motion for judgment on the pleadings.

In affirming the trial court's judgment, the appellate court found that the December 22, 1976, letter "clearly and unmistakenly exhibited the intention of the claimants to press a legal claim against plaintiff for damages based on alleged professional malpractice. That letter justified the able and experienced trial judge in determining that

plaintiff should have 'reasonably foreseen' circumstances under which a suit for malpractice might very well be filed against him." 116 Ill. App. 3d at 356.

▇▇ ▇ Although there are some similarities between the letter in *Stiefel* and the July 23, 1982, letter in the present case, the important distinguishing factor is the policy language in each case. As previously stated, in *Stiefel*, the policy provided that it applied "to negligent acts, errors, omissions or offenses which occur anywhere in the world: *** prior to the effective date of the Policy if claim is first made during the Policy period and providing no insured had knowledge nor could have reasonably foreseen any circumstance which might result in a claim at the effective date of the Policy ***." (116 Ill. App. 3d at 354.) Therefore, in order to establish that the attorney's letter provided sufficient notice of a claim to the insured, IUI had only to prove that, based upon the letter, the insured could have reasonably foreseen circumstances which might result in a claim. Proof of this degree of awareness is based upon an objective, rather than a subjective, evaluation of the facts. (*Ratcliffe v. International Surplus Lines Insurance Co.* (1990), 194 Ill. App. 3d 18, 550 N.E.2d 1052.) By contrast, the Policy in the present case provides that Epstein is not covered "for claims of which [it] had prior knowledge." Therefore, in order to establish that the July 23, 1982, letter provided sufficient notice of a claim so as to bar coverage under the claims-made provision, Gibraltar must establish that the letter imputed actual "knowledge of a claim" to Epstein, not just a reasonable expectation of a claim. Further adding to Gibraltar's burden of proof is the Policy's definition of "claim." Pursuant to the Policy, the relevant definition of "claim" is an "allegation." Although not defined in the Policy, the commonly understood meaning of "allegation" is "[t]he assertion, claim, declaration or statement of a party to an action, made in a pleading, setting out what he expects to prove." (Blacks Law Dictionary 99 (4th ed. 1968).) Application of this definition to the July 23, 1982, letter demonstrates that the letter is not a "claim." Instead, the letter merely informed Epstein that a preliminary investigation indicated that Hammond-Columbia had been damaged due to the negligence, nonfeasance and malfeasance of Epstein and others. Arguably, the letter would satisfy the "reasonably foreseeable" language of the *Stiefel* policy or the "might reasonably be expected" language of question 24a on the Policy application, but it does not constitute actual knowledge of a claim which, pursuant to the terms of the Policy, is required to bar coverage under the claims-made provision. There is no evidence in the record that Epstein had actual knowledge of a claim, as "claim"

is defined in the Policy. In fact, the generalized substance of the letter directly belies any argument that it had provided actual knowledge of a claim to Epstein. The oblique reference in the letter to damage due to negligence, nonfeasance and malfeasance failed to specify the alleged negligent acts, the employees involved or the type of damage incurred. Not only did Epstein have no idea as to what it had allegedly done, it also did not know if a professional liability policy would even be applicable. The nonspecific nature of the letter is further evidenced by the fact that a substantively identical letter had been sent to Northern Industrial Steel Corporation, which had also performed work on the roof of the Hammond-Columbia warehouse.

Similar to *Stiefel,* the cases relied upon by Epstein are also distinguishable from the present case by the language of the relevant policies. (*Hoyt v. St. Paul Fire & Marine Insurance Co.* (9th Cir. 1979), 607 F.2d 864; *Bensalem Township v. Western World Insurance Co.* (E.D. Pa. 1985), 609 F. Supp. 1343.) In *Hoyt,* the policy states that coverage will be provided if the insured "had no knowledge or could not have reasonably foreseen any circumstance which might result in a claim or suit." (*Hoyt,* 607 F.2d at 865.) In *Bensalem,* the policy required that the insureds notify insurer as soon as practicable if they receive "written or oral notice from any party that it is the intention of such party to hold the insured's responsible for a Wrongful Act." (*Bensalem,* 609 F. Supp. at 1348.) Neither of these provisions is relevant to the present case.

■ Finally, Gibraltar contends that the trial court erred when it reversed its previous position and dismissed the third amended complaint. Specifically, Gibraltar claims that at the hearing on the cross motions for summary judgment, the trial court "suggested *** in dictum" that if Gibraltar properly pled a complaint referencing the allegedly incomplete insurance application, it would withstand a section 2—615 motion to dismiss. (Ill. Rev. Stat. 1989, ch. 110, par. 2—615.) Subsequently, when Gibraltar filed its third amended complaint alleging misrepresentations in the application, the trial court dismissed the complaint based on Gibraltar's failure to comply with section 154.

In our view, this argument is waived on the grounds that it is void of any legal authority (*Brown v. Tenney* (1988), 125 Ill. 2d 348, 532 N.E.2d 230), and the argument was not raised in the trial court. (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 475 N.E.2d 872.) Furthermore, even if the argument were not waived, it is without merit. The trial court's statement was not a guarantee of the results of an amended claim. It is axiomatic that until the issue is before the court and both sides have had an opportunity to present

their arguments, comments by the court are not legally binding. Instead, they are merely suggestions or *dictum*, as Gibraltar itself characterizes them. Any reliance by Gibraltar was unfounded.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

O'CONNOR and MANNING, JJ., concur.