AMERICAN CONTINENTAL
INSURANCE COMPANY,
Plaintiff,

v.

MARION MEMORIAL HOSPITAL,
Defendant.

Civ. No. 89–4041.

United States District Court,
S.D. Illinois.

Sept. 6, 1991.

Richard A. Green, Feirich, Schoen, Mager & Green, Carbondale, Ill., Steven F. Molo, Winston & Strawn, Chicago, Ill., for plaintiff.

James K. Powless, Bruce W. Mitchell, Mitchell & Armstrong, Marion, Ill., for defendant.

## MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

Before the Court are cross-motions for summary judgment (Document Nos. 24 and 26) on the plaintiff's complaint for declaratory judgment. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and venue is proper in the Southern District of Illinois.

### I. FACTS

The basic facts of this case are undisputed. On July 1, 1987, the plaintiff, American Continental Insurance Company (ACIC), issued a hospital liability indemnification insurance policy to the defendant, Marion Memorial Hospital. Plaintiff's Exhibit A. The policy was a "claims made" policy, which provided that coverage applied "only to claims first made during this policy period arising from occurrences which take place subsequent to the retroactive dates stated in the Declarations for the particular coverage involved." *Id.* at 3. The Declarations identified the policy period as July 1, 1987, to July 1, 1988, with a retroactive date of June 1, 1985.

A claim is first made under the policy at the earlier of the following times:

(a) When the insured(s) first gives written notice to [the insurance company] that a claim has been made, or

(b) when you or any insured receives written notice of a claim, or

(c) When the insured first gives written notice [to the insurance company] of a specific occurrence involving a particular person or situation which might reasonably be expected to result in a claim(s). Incident reports made by the insured to [the insurance company] as part of engineering or loss control shall not be considered notice of claim(s).

*Id.* at 4.

The policy includes a number of exclusions. At issue in this case is Exclusion No. 8, which provides that the policy does not apply

[t]o liability of the insured for damages resulting from an injury, harm, or loss if, prior to the inception of this policy period, any claim has been made against the insured by anyone for such damages *or if the insured could have reasonably foreseen that such injury, harm, or loss might result in a claim for such damages.*

*Id.* at 7 (emphasis added). This exclusion is further emphasized in a separate endorsement which provides that

It is hereby understood and agreed that such insurance as is afforded by this policy does not apply to any claim made or suit brought against the insured:

1. Prior to (July 1, 1987), whether or not such claim or suit has been reported to any liability insurer; or

2. Arising out of an occurrence which took place, in whole or in part, prior to (July 1, 1987), if the insured was aware or reasonably should have been aware prior to the effective date of this policy that such occurrence might be expected to result in a claim or suit.

*Id.* Endorsement No. 8.

Prior to July 1, 1987, the hospital was covered by an insurance policy issued by the Ohio Hospital Insurance Company (OHIC). Defendant's Exhibit 8. The OHIC policy also was a "claims made" policy covering incidents "occurring subsequent to the retroactive date for which claim is first made against the insured and reported to the company during the policy period." *Id.* at 2. A claim is first made under the OHIC policy "(a) when the insured first gives written notice to the company that a claim has been made, or (b) when the insured first gives written notice to the company of specific circumstances involving a particular person which may result in a claim." *Id.*

Hospital administrator Merle Aukamp knew that under a "claims made" policy, the hospital had a duty to report potential claims to the insurance company. Aukamp Deposition at 11, 51, 54, 77–78. He also knew that the incident need not involve an actual or threatened lawsuit at the time that the hospital was required to report it. *Id.* at 54–55. As a matter of practice, Aukamp had reported a number of incidents to OHIC even though no lawsuit had been filed or threatened. *See* Plaintiff's Exhibit D; Aukamp Deposition at 63–68. The incidents he reported were brought to his attention through inquiries for medical records, subpoenas, suits being filed and incident reports submitted by hospital employees regarding suspicious occurrences. *Id.* at 46–47.

The hospital decided to switch insurance carriers in 1987 because OHIC had begun requiring its insureds to purchase stock in the company. *Id.* at 42–43. As a municipal entity, the hospital could not comply with this requirement, so it secured a consultant, Arthur Gallagher, to help find a new insurance carrier. *Id.* Gallagher helped the hospital obtain the ACIC policy. *Id.* at 72.

Prior to issuing a policy to the hospital, ACIC had a consultant, Denise Doheny, review a risk management questionnaire filled out by the hospital. Doheny Deposition at 54; *see* Defendant's Exhibits 10 and 11. In summarizing her findings, Doheny noted a concern that the hospital had no risk manager or risk management program in place at that time. Defendant's Exhibit 10 at 1–2. However, she felt comfortable with most other aspects of the hospital's procedures and policies, including the process for identifying incidents that might

result in insurance claims. *Id.* at 2–4.[1] Based upon her evaluation, Doheny recommended that the underwriters quote an insurance policy to the hospital. *Id.* at 1; Doheny Deposition at 63.

The claim at issue in this lawsuit arose from the birth of Dustin Jackson on September 6, 1985. The baby's mother, Yvonne Tison, was diagnosed by Dr. Ko as having fetal distress, labor, and mild preeclampsia. Plaintiff's Exhibit F. Fetal monitor tracings showed an "ominous fetal heart rate pattern" and meconium-stained amniotic fluid was noted. Plaintiff's Exhibit H. After consultation with a second physician, Dr. Ko performed an emergency cesarean section.

The infant's Apgar score [2] at one minute was 6 and at five minutes was 7. Plaintiff's Exhibit J. His initial color was dusky but improved within several hours. Plaintiff's Exhibit L. He became jittery within a few hours after birth, and the physicians ultimately diagnosed the problem as hypoglycemia. Plaintiff's Exhibit I and L. The infant improved throughout the hospital stay and was released with his mother on September 11, 1985. *See* Plaintiff's Exhibits I and L. However, he was brought back to the hospital six weeks later for persistent vomiting. Plaintiff's Exhibit M. There was no clear diagnosis, but the physician's impression was to rule out an allergy to cow's milk. *Id.*

During the next seventeen months, the hospital received four requests for Yvonne Tison and Dustin Jackson's medical records. In March 1986, Coleman Tri-County Services requested the infant's medical records so that he could be enrolled in a program for children with developmental problems. Plaintiff's Exhibit P. In April 1986, the University of Illinois Division of Services for Crippled Children requested his records. Plaintiff's Exhibit Q. Seven months later, in November 1986, the hospital received a request to provide Yvonne Tison's medical records to the law firm of John Paul Womick and Associates. Plaintiff's Exhibit R. In March 1987, Womick made a second request—this one for the fetal heart monitoring tracings. Plaintiff's Exhibit S.

The two women from the medical records department who processed Womick's request knew that Womick was a plaintiff's personal injury lawyer. Wollard Deposition at 67–68; Dippie Deposition at 20–21. One of them, June Wollard, the assistant director of the department, knew that Womick handled medical malpractice cases. Wollard Deposition at 62. Hospital administrator Aukamp also was aware of Womick's reputation as a plaintiff's personal injury lawyer and he knew that Womick had filed seven or eight suits against the hospital. Aukamp Deposition at 100–02. However, he testified that he was not aware of Womick's requests for Tison's medical records.

During his deposition, Aukamp was asked whether the circumstances of Jackson's birth,[3] coupled with two requests for medical records from agencies that assist disabled children and two requests from an

---

**1.** "The process that was explained to me by Mr. Johnson left me comfort that they had—even though they didn't have a designated risk manager—they had a process for being notified of incidents that might relate to claims, and tying it into medical records for notification." Doheny Deposition at 71.

**2.** Newborn infants are evaluated and given an Apgar score one minute after delivery and five minutes after delivery. The newborn's heart rate, respiration, muscle tone, response to stimuli, and color are each rated 0, 1, or 2. The infant's total score thus ranges from 0 to 10.

**3.** The hospital's attorney objected to the hypothetical on the ground that it may or may not assume facts in evidence and because it asked a clinical opinion of someone who is not qualified to give such an opinion. The Court overrules the objection. The only factual misstatement in the hypothetical is that Yvonne Tison's preeclampsia was described as severe, when in reality it was mild. The Court finds this distinction insignificant in the context of the hypothetical as a whole—particularly when Aukamp testified that he had only a partial understanding of preeclampsia. The fact that Aukamp is not a medical expert is immaterial. He was not asked a question which required medical expertise. Rather, he was asked whether the circumstances constitute a reportable incident. As the person responsible for making this determination at the hospital, he clearly was qualified to answer the question.

attorney, would constitute a sufficient occurrence that might be expected to result in a claim or suit against the hospital. *Id.* at 94–97. His answer was "Yes, if known." *Id.* at 97. He then clarified the statement to mean "[i]f known by me." *Id.*

The hospital had no formal *written* procedures for assuring that medical records requests from attorneys were brought to the attention of the hospital administration. However, Aukamp testified that there were policies in place to assure that he was notified about attorney requests that might implicate a potential lawsuit against the hospital. *Id.* at 85, 104–11, 113–14. He speculated that he wasn't notified about Womick's requests because the medical records department thought that Womick was seeking the records for other reasons. *Id.* at 89–94, 114–16, 125–26.

The two women who processed Womick's requests, however, knew that there might be a lawsuit concerning the medical care of Yvonne Tison and Dustin Jackson. Wollard Deposition at 87, 96; Dippie Deposition at 37–38, 45. June Wollard testified that it was standard practice to send copies of such attorney requests to the administration. Wollard Deposition at 63, 86–87, 96–98. More specifically, she testified that copies of Womick's requests *should* have been sent to the administration, but she could not say for certain whether they actually were sent along. *Id.* at 86–87, 96–98.

Carolyn Dippie, the other woman who processed Womick's requests, stated that it was not part of her job to make copies of attorney requests for the administration. Dippie Deposition at 28–31. Because her supervisors opened the mail and saw the requests first, Dippie says that she left it up to them to determine whether the hospital was involved or not. *Id.* at 38–39. June Wollard does not specifically state who had responsibility to send copies of Womick's requests to the administration.

On August 31, 1987, Womick filed suit against the hospital and its doctors, alleging malpractice in connection with the birth of Dustin Jackson. Administrator Aukamp states that he had no written or oral notice from Yvonne Tison and Dustin Jackson before the suit was filed. Defendant's Exhibit 2. After receiving service of the summons and complaint, the hospital notified ACIC of the Jackson claim.

On February 15, 1988, ACIC sent the hospital a letter formally denying coverage of the claim based upon Exclusion No. 8. Defendant's Exhibit 3. On February 23, 1989, ACIC filed the pending complaint for declaratory judgment to declare the rights and duties of the parties under the insurance policy.

## II. ANALYSIS

The issue in this case is whether the hospital "was aware or reasonably should have been aware" prior to July 1, 1987, that the circumstances surrounding Dustin Jackson's birth "might be expected to result in a claim or suit." If so, Jackson's claim is excluded from coverage under Exclusion No. 8 and Endorsement No. 8 of the ACIC policy. Therefore, resolution of this issue requires interpretation of these provisions in the insurance policy.

"In construing an insurance contract, words in the policy are to be given their plain and ordinary meaning, and a court should not search for ambiguity when none exists.... When the policy contains an explicit limitation on coverage, this language must be effectuated." *Stiefel v. Illinois Union Ins. Co.*, 116 Ill.App.3d 352, 72 Ill.Dec. 141, 143, 452 N.E.2d 73, 75 (1st Dist.1983) (citations omitted).

The exclusions in the insurance policy in the case at bar are virtually identical to the provisions at issue in *Stiefel.* Thus, here, as in *Stiefel*, "the insured must not have knowledge of circumstances occurring prior to the policy period from which a claim might reasonably have been foreseen." *Id.* at 355–56, 72 Ill.Dec. at 144, 452 N.E.2d at 76. Therefore, the Court must determine whether the circumstances of Dustin Jackson's birth, coupled with two medical records requests from social service agencies and two requests from a plaintiff's personal injury lawyer, constitutes sufficient notice to the hospital that a claim might be filed.

■ The evidence shows that complications arose during Jackson's birth, ultimately resulting in an emergency cesarean section, and that the newborn's physical condition was less than optimum. These circumstances, standing alone, would not necessarily put the hospital on notice that a claim would be filed. Similarly, the receipt of the records requests from Coleman Tri-County Services and the University of Illinois Division of Services for Crippled Children would not necessarily indicate that a claim was in the offing. Although the requests might indicate that the child was having developmental problems, there is no indication that the problems were related to the complications at birth or that the family believed that the problems were related to the birth.

The hospital was put on notice of a potential claim, however, when attorney John Paul Womick requested Yvonne Tison's medical records in November 1986 and March 1987. Even if the Court were to agree that the first request—a general request for all of Tison's records—did not signal a potential lawsuit against the hospital itself, the second request—which specifically targeted the fetal monitoring strips—clearly indicated that any potential lawsuit would be related to the complications of Dustin Jackson's birth.

The testimony of hospital administrator Aukamp and the medical records department employees supports this conclusion. Aukamp himself testified that had he known about these circumstances, he would have considered it a reportable incident. Aukamp Deposition at 94–97. The only problem was that Womick's records requests were not brought to Aukamp's attention. Aukamp tries to suggest that he wasn't notified about Womick's requests because the medical records department did not think that the requests implicated a potential lawsuit against the hospital. But the testimony of June Wollard and Carolyn Dippie is to the contrary.

Both Wollard and Dippie testified that they assumed that Womick's requests meant a potential lawsuit against the hospital regarding Dustin Jackson's birth.

Moreover, Wollard testified that it was standard practice to notify the administration about medical records requests from attorneys. She said that Womick's requests *should* have been forwarded to the administration, but she could not say for certain whether that procedure was in fact. followed.

Based upon these facts, it is clear that the hospital "reasonably should have been aware" prior to July 1, 1987, that the circumstances surrounding Dustin Jackson's birth "might be expected to result in a claim or suit." Therefore, Jackson's claim is excluded from coverage under Exclusion No. 8 and Endorsement No. 8 of the ACIC policy.

The hospital argues that Exclusion No. 8 should be more narrowly construed. In support of this proposition, the hospital cites *General Accident Insurance Co. of America v. Trefts*, 657 F.Supp. 164, 167 (E.D.Mo.1987), which involved interpretation of the following question on an application for a lawyers professional liability insurance policy: "Does any lawyer [in the applicant's law firm] know of any circumstances, act, error or omission that could result in a professional liability claim against him or his predecessors in business?" *Id.* at 165.

Judge Hungate construed the question to require disclosure of circumstances that could result in a claim "only in those circumstances when a client has given to the lawyer some indication through a complaint or expression of dissatisfaction with his services that a claim might or would be made." *Id.* at 167. Thus, the hospital argues in the instant case that Exclusion No. 8 should be construed to apply only to those circumstances in which a patient has given the hospital some indication through a complaint or an expression of dissatisfaction with the hospital's services that a claim might arise.

The *Trefts* case is distinguishable in several important respects. First, the precise language of the application asks whether a lawyer "knows" of any circumstances that could result in a claim. This language was properly construed as requiring actual

knowledge upon the part of lawyer. *Cf. Gibraltar Casualty Co. v. A. Epstein & Sons,* 206 Ill.App.3d 272, 150 Ill.Dec. 236, 562 N.E.2d 1039 (1st Dist.1990) (policy excluded coverage "for claims of which [the insured] had prior knowledge."). The ACIC policy, in contrast, excludes coverage for incidents in which the insured "could have reasonably foreseen" that a claim might arise. This language requires only a reasonable expectation of a claim—not actual knowledge of a claim.

Secondly, the testimony of record in *Trefts* indicated that the application question "was construed to require information of which a named insured lawyer would have actual knowledge, for instance if a client had stated a circumstance might lead to a malpractice claim or dispute." *Trefts,* 657 F.Supp. at 166. In the instant case, on the other hand, the evidence indicates that the hospital knew that it should report incidents that could might result in claims—even in the absence of a complaint or the threat of a lawsuit.

The hospital's reliance upon *Hoyt v. St. Paul Fire & Marine Ins. Co.,* 607 F.2d 864 (9th Cir.1979), is similarly misplaced. That case did not involve a question of whether a claim was foreseeable. Rather, the issue in *Hoyt* was whether a letter sent to the insured by an attorney constituted a claim made during the policy period. The court suggested that the letter put the insured on notice that a claim might be expected to follow, but the court found that no formal claim had been filed. *Id.* at 866. Thus, *Hoyt* is contrary to the hospital's position, as are the remainder of the cases cited by the hospital.

The hospital next argues that ACIC should be estopped from denying coverage of the Jackson claim because ACIC knew, based upon consultant Denise Doheny's evaluation, that the hospital had an inade-

quate risk management program. In making this argument, the hospital relies upon *Boyles v. Freeman,* 21 Ill.App.3d 535, 315 N.E.2d 899, 902 (1st Dist.1974), in which the court acknowledged the general rule that

> when an insured in good faith qualifies his statements [on an application for insurance], the insurer has the choice of ignoring the limitation or refusing the risk, but it cannot ignore the limitation and then seek to avoid the policy because the statement without the qualifications is false.

The hospital argues that by explaining its current procedures to Doheny, it had "qualified" its statements regarding risk management at its institution. As a result, the hospital contends that ACIC cannot seek to avoid the policy on the basis that had the hospital employed proper risk management procedures it would have known or should have known of a potential claim.

The first problem with this argument is that ACIC is not trying to avoid the entire policy for a false statement on the application form, as in *Boyles.* Rather, ACIC has denied coverage *for a particular claim* on the ground that the policy excludes coverage for that claim. Thus, *Boyles* is inapposite.[4]

The second problem is that the hospital fails to distinguish between risk management procedures in general and specific procedures for determining whether an incident or occurrence at the hospital might result in an insurance claim. Here, ACIC found the hospital's risk management program to be inadequate, but the consultant stated that she was comfortable with the hospital's procedures for identifying potential claims. Thus, ACIC could reasonably assume that the hospital had proper procedures in place to identify potential claims.

4. As the Seventh Circuit pointed out, "an insurer is entitled to truthful responses to all questions on an application so that it may correctly evaluate the risk and determine whether the applicant meets its underwriting standards." *Apolskis v. Concord Life Ins. Co.,* 445 F.2d 31, 35 (7th Cir.1971). Thus, where an insurance company agrees to provide insurance based upon quali-

fied statements in the application, the company has agreed to accept the risks of insuring the applicant. As a result, the company cannot avoid the policy altogether. However, the company's liability is still limited by the extent of coverage provided to the insured. Here, the issue concerns exclusions under the policy, not an attempt to void the entire policy.

In fact, the hospital did have proper procedures in place. Both Aukamp and Wollard stated that it was standard procedure for the hospital administration to be notified when an attorney makes a request for a patient's medical records under circumstances that suggest that a potential claim against the hospital. Thus, the problem here is not that the procedures were inadequate; rather, the problem arose because the procedures apparently were not followed. Accordingly, the hospital's estoppel defense must be rejected.

## III. SUMMARY

Based upon the foregoing analysis, the Court GRANTS the plaintiff's Motion for Summary Judgment (Document No. 24) and DENIES the defendant's Motion for Summary Judgment (Document No. 26). Accordingly, the Court DECLARES that the plaintiff properly denied coverage for the Dustin Jackson claim.

IT IS SO ORDERED.